7 U.S. 499
 3 Cranch 499
 2 L.Ed. 511
 SANDS
v.
KNOX.
 February Term, 1806
 
 1
 ERROR to the court for the trial of impeachments, and the correction of errors, in the state of New-York.
 
 
 2
 Thomas Knox, administrator, with the will annexed, of Raapzat Heyleger, a subject of the king of Denmark, brought an action of trespass vi et armis, in the supreme court of judicature, of the state of New-York, against Joshua Sands, collector of the customs for the port of New-York, for seizing and detaining a schooner called the Jennett, with her cargo. The defendant, Sands, pleaded in justification, that he was collector, &c. and that after the 1st day of July, 1798, viz. on the 16th of November, 1798, the said schooner, then being called The Juno, was owned by a person resident within the United States, at Middletown, in Connecticut, and cleared for a foreign voyage, viz. from Middletown to the island of St. Croix, a bond being given to the use of the United States, as directed by the statute, with condition that the vessel should not, during her intended voyage, or before her return within the United States, proceed, or be carried, directly or indirectly, to any port or place within the territory of the French republic, or the dependencies thereof, or any place in the West-Indies, or elsewhere, under the acknowledged government of France, unless by stress of weather, or want of provisions, or by actual force or violence, to be fully proved and manifested before the acquittance of such bond, and that such vessel was not, and should not be employed during her said intended voyage, or before her return as aforesaid, in any traffic or commerce, with, or for any person resident within the territory of that republic, or in any of the dependencies thereof. That afterwards, on the 8th of December, 1798, she did proceed, and was voluntarily carried from Middletown to the island of St. Croix, in the West-Indies, and from thence, before her return within the United States, to Port de Paix, in the island of St. Domingo, being then a place under the acknowledged government of France, without being obliged to do so by stress of weather, or want of provisions, or actual force and violence, whereby, and according to the form of the statute, the said schooner and her cargo became forfeited, the one half to the use of the United States, and the other half to the informer; by reason whereof, the defendant, being collector, &c. on the 1st of July, 1799, arrested, entered, and took possession of the said vessel and cargo, for the use of the United States, and detained them as mentioned in the declaration, and as it was lawful for him to do.
 
 
 3
 The plaintiff, in his replication, admitted that the defendant was collector, &c. that at the time she sailed from Middletown for St. Croix, she was owned by a person then resident in the United States; and that a bond was given as stated in the plea; but alleged, that she sailed directly from Middletown to St. Croix, where she arrived on the 1st of February, 1799, the said island of St. Croix, then and yet being under the government of the king of Denmark. That one Josiah Savage, then and there being the owner and possessor of the said vessel, sold her, for a valuable consideration, at St. Croix, to the said Raapzat Heyleger, who was then, and until his death continued to be, a subject of the king of Denmark, and resident at St. Croix, who, on the 1st of March following, sent the said vessel, on his own account, and for his own benefit, on a voyage from Port de Paix to St. Croix, Without that, that she was at any other time carried, &c.
 
 
 4
 To this replication there was a general demurrer and joinder, and judgment for the plaintiff, which, upon a writ of error to the court for the trial of impeachments and correction of errors, in the state of New-York, was, to this court, affirmed.
 
 
 5
 The defendant now brought his writ of error, to this court under the 25th section of the judiciary act of the United States, vol. 1, p. 63.
 
 
 6
 The only question which could be made in this court, was upon the construction of the act of congress, of June 13th, 1798, vol. 4 p. 129, commonly called the non-intercourse act; the 1st section of which is in these words: 'That no ship or vessel, owned, hired, or employed, wholly or in part, by any person resident within the United States, and which shall depart therefrom after the 1st day of July next, shall be allowed to proceed directly, or from any intermediate port or place, to any port or place within the territory of the French republic, or the dependencies thereof, or to any place in the West-Indies, or elsewhere, under the acknowledged government of France, or shall be employed in any traffic or commerce with or for any person, resident within the jurisdiction, or under the authority of the French republic. And if any ship or vessel, in any voyage thereafter commencing, and before her return within the United States, shall be voluntarily carried, or suffered to proceed to any French port or place, as aforesaid, or shall be employed as aforesaid, contrary to the intent hereof, every such ship or vessel, together with her cargo, shall be forfeited, and shall accrue, the one half to the use of the United States, and the other half to the use of any person or persons, citizens of the United States, who will inform and prosecute for the same; and shall be liable to be seized, prosecuted, and condemned, in any circuit or district court of the United States, which shall be holden within and for the district where the seizure shall be made.'
 
 
 7
 The condition of the bond, stated in the plea, corresponded exactly with that required by the 2d section of the act.
 
 
 8
 The 70th section of the act of 2d of March, 1799, vol. 4, p. 390, makes it the duty of the several officers of the customs, to seize any vessel liable to seizure, under that or any other act of congress respecting the revenue.
 
 
 9
 C. Lee, for the plaintiff in error.
 
 
 10
 The question is, whether the act of congress does not impose a disability upon the vessel itself?
 
 
 11
 This vessel was clearly within the literal prohibition of the act. She was 'owned wholly by a person resident within the United States.' She did 'depart therefrom after the 1st day of July (then) next.' She did 'proceed from an intermediate port or place, to a place in the West-Indies, under the acknowledged government of France.' She was also a vessel which, 'in a voyage thereafter commencing, and before her return within the United States,' was 'voluntarily carried, or suffered to proceed, to a French port.' She had, therefore, done and suffered every act, which, according to the letter of the law, rendered her liable to forfeiture, seizure, and condemnation.
 
 
 12
 It is true, that the decision of this court, in the case of the Charming Betsey, ante, vol. 2, p. 115, seems at first view to be against us. But the present question was not made, and could not arise in that case, because that vessel had not been to a French port, nor had she returned from a French port to the United States. If such a trade as the present case presents, were to be permitted, the whole object of the non-intercourse act would be frustrated. A vessel of the United States may, according to the judgment in the case of the Charming Betsey, the sold and transferred to a Dane, and he may trade with her as he pleases; but we say it is with this proviso, tht he does not send her from a French port to the United States. He takes the vessel with that restriction. If he trades to the United States, he is bound to know and respect their laws. The intention of the law was not only to prevent American citizens, but American vessels, from carrying on an intercourse with French ports.
 
 
 13
 The case of the Charming Betsey was under the act of February, 1800; but the present case arises under that of 1798, which is very different in many respects. The opinion in that case, so far as it was not upon points necessarily before the court, is open to examination.
 
 
 14
 Neither the words of the law, nor the form of the bond, make any exception of the case of the sale and transfer of the vessel before her return. If therefore a sale is made it must be subject to the terms of the law; and although the vessel may not be liable to seizure upon the high seas, yet upon her return to the United States, it became the duty of the custom-house officer to seize her. The law ought to be so construed as to carry into effect the object intended. That object was, to cut off all intercourse with France, and by that means compel her to do justice to the United States. But if this provision of the law is to be so easily eluded, France will be in a better situation than before, for she will receive her usual supplies and we shall be weakened by the loss of the carrying trade.
 
 
 15
 Bayard, contra, was stopped by the court.
 
 
 16
 MARSHALL, Ch. J.
 
 
 17
 If the question is not involved, whether probable cause will justify the seizure and detention; if there are no facts in the pleadings which show a ground to suspect that there was no bona fide sale and transfer of the vessel, the court does not wish to hear any argument on the part of the defendant in error.
 
 
 18
 It considers the point as settled by the opinion given in the case of the Charming Betsey, with which opinion the court is well satisfied.
 
 
 19
 The law did not intend to affect the sale of vessels of the United States, or to impose any disability on the vessel, after a bona fide sale and transfer to a foreigner.
 
 
 20
 Judgment affirmed.